



## IN THE

# Court of Appeals of Indiana

Tamara Kay,

*Appellant-Plaintiff*

v.

The Irish Rover Inc.,

*Appellee-Defendant*

---

January 30, 2025

Court of Appeals Case No.
24A-CT-335

Appeal from the St. Joseph Superior Court

The Honorable Steven H. David, Senior Judge

Trial Court Cause No.
71D04-2305-CT-264

---

**Opinion by Judge Mathias**
Judges Brown and Kenworthy concur.

**Mathias, Judge.**

[1] Dr. Tamara Kay appeals the St. Joseph Superior Court's order granting The Irish Rover, Inc.'s, motion to dismiss her defamation claim. Specifically, the trial court concluded that The Irish Rover was exercising its First Amendment right to free speech on a public issue when it published two newspaper articles with the alleged defamatory statements, and that it published the articles in good faith and with a reasonable basis in law and fact. Therefore, the trial court dismissed Dr. Kay's lawsuit under Indiana's anti-SLAPP Statute. Dr. Kay appeals and argues that genuine issues of material fact exist concerning whether The Irish Rover published the articles in good faith and with a reasonable basis in law and fact.

[2] We affirm.

## Facts and Procedural History

[3] On the dates the alleged defamation occurred, Dr. Kay was a tenured professor in the Keough School of Global Affairs and the Sociology Department at the University of Notre Dame. Her "academic research and teaching is focused on trade, labor, social movements, globalization, organizations, and global health which includes reproductive health and rights." Appellant's App. Vol. 2, p. 14 (quotation marks omitted). Many of Dr. Kay's extensive writings in journals, newspapers, and on Twitter focus on advocating for abortion legalization.

[4] The Irish Rover is an independent, student newspaper at the University. The newspaper is prepared and edited by Notre Dame students and is free to anyone

on campus. It is available publicly on The Irish Rover's website. Members of the public may also purchase a subscription to the newspaper. The newspaper's board of directors is comprised of alumni, and several members of the faculty advise the student editors and writers.

[5] After the United States Supreme Court decided *Dobbs v. Jackson Woman's Health Organization* on June 24, 2022, Dr. Kay "became more outspoken on the issue of abortion access," including more frequent posts on Twitter. *Id*. at 15. On September 15, 2022, the Indiana General Assembly's legislation limiting abortion in Indiana took effect, although it was enjoined shortly thereafter.

[6] On September 15, Dr. Kay placed a sign on her office door that read: "This is a SAFE SPACE to get help and information on ALL healthcare issues and access—confidentially and with care and compassion." *Id*. at 17. She placed a "J" surrounded by a circle on her door, which can be a symbol for persons who are advocating for abortion rights and access. *Id*. Dr. Kay also tweeted: "Such a devastating day to be a woman in IN. But women faculty @NotreDame are organizing. We are here (as private citizens, not representatives of ND) to help you access healthcare when you need it, & we are prepared in every way. Look for the 'J[.]' Spread the word to students!" *Id*. She also tweeted links to organizations providing Plan B and Plan C abortifacient pills. *Id*.

[7] Several professors and students communicated with The Irish Rover concerning Dr. Kay's advocacy and tweets about abortion rights. On September 21, Dr. Kay participated in a panel event titled "Post-Roe America: Making

Intersectional Feminist Sense of Abortion Bans." *Id.* at 19. Joseph DeReuil, a student editor of The Irish Rover, attended the event. After the event concluded, he spoke to Dr. Kay for approximately twenty minutes. He recorded the conversation without her knowledge but "in compliance with Indiana's one-party consent recording law." *Id.* On October 5, 2022, DeReuil sent Dr. Kay an email to request a follow-up meeting, but she did not respond.

[8] DeReuil wrote an article about the September panel event that was published in The Irish Rover on October 22. In addition to attending the event and speaking with Dr. Kay, he reviewed her social media, the photograph of the sign on her office door, and her published writings on abortion rights and access. The headline of DeReuil's article was "Keough School Professor Offers Abortion Access to Students." *Id.* at 20. The subheadline stated, "Abortion assistance offered to students despite IN law, ND policy." *Id.* Dr. Kay's statements on social media and on her office door sign were quoted in the article. The Irish Rover published the article on its website and tweeted a link to the article with the following statement: "Notre Dame Professors Help Students Obtain Abortions." *Id.* at 21.

[9] Shortly after the article was published, Dr. Kay received threatening and vulgar emails from alumni and others concerning her advocacy for abortion access. Her property was also vandalized. The founder of a Notre Dame alumni group, the Sycamore Trust, sent an email to several members of the University administration suggesting that Dr. Kay should not be employed by the University. The Sycamore Trust also posted a letter concerning Dr. Kay on its

website and sent a postcard to alumni mirroring the language of the October 12 article. The University administration received additional complaints about Dr. Kay's continued employment at Notre Dame. On December 6, the Chicago Tribune published a letter from University President Father John Jenkins affirming Dr. Kay's academic freedom but also disagreeing with Dr. Kay's prior editorial published in that newspaper, which discussed the University's anti-abortion position.

[10] While Dr. Kay was on a pre-planned sabbatical during the Spring 2023 semester, she agreed to speak to the Notre Dame College Democrats. That event occurred on March 7, 2023. Dr. Kay spoke to the students about her career, activism, and research on access to abortion. Dr. Kay also answered student questions. Luke Thompson, a student staff member of The Irish Rover, attended the event. He did not interview Dr. Kay but took notes at the event and reviewed a recording of the lecture.

[11] On March 22, The Irish Rover published an article about the March 7 lecture, which included a hyperlink to the prior October article about Dr. Kay. The March article stated that Dr. Kay had "been subject to national uproar over the past few months over her support for abortion at a Catholic university, which included posting offers to procure abortion pills on her office door." *Id*. at 23. The article described Dr. Kay's discussion concerning academic freedom with the attendees. The article paraphrased the questions asked and Dr. Kay's responses.

[12] On May 23, 2023, Dr. Kay filed a lawsuit alleging defamation against The Irish Rover for publishing the two newspaper articles. Concerning the October article, the complaint only specifically references the title of the article. But Dr. Kay referenced several statements from the March article that she alleged were false and defamatory.

[13] In response, the newspaper filed a motion to dismiss pursuant to Indiana Code section 34-7-7-9, i.e., Indiana's anti-SLAPP Statute. The Irish Rover asserted that its statements in the articles were both true and made in good faith with a reasonable basis in law and fact. In support of its motion, the newspaper submitted publications by or co-authored by Dr. Kay, the two Irish Rover articles at issue, a transcript of the March 7 lecture, and statements made by Dr. Kay on social media. In opposition, Dr. Kay submitted, in pertinent part, her own affidavit, emails and texts concerning issues related to the articles, the threatening emails she received, the Sycamore Trust's letter and postcard, a photograph of the sign on her office door, and a transcript of the September 21, 2022, event.

[14] The trial court properly treated the anti-SLAPP motion to dismiss as a motion for summary judgment and held a hearing on the motion. Thereafter, the trial court issued extensive findings of fact and conclusions of law in which the court concluded that The Irish Rover had acted in good faith and with a reasonable basis in law and fact. The court thus dismissed Dr. Kay's complaint.

[15] Dr. Kay now appeals.

## Discussion and Decision

"Public participation is fundamental to self-government, and thus protected by the Indiana and United States Constitutions." *Gresk ex rel. Est. of VanWinkle v. Demetris*, 96 N.E.3d 564, 566 (Ind. 2018). As early as the 1970s, "ordinary individuals were being sued for simply speaking out politically." *Id.* at 568. Such lawsuits eventually became known as SLAPPs, or Strategic Lawsuits Against Public Participation. *Id.* The defining goal of a SLAPP is "not to win, but to silence political opposition with delay, expense, and distraction." *Id.* (internal quotation omitted).

"Indiana adopted its anti-SLAPP statute in 1998 to address and reduce abusive SLAPP litigation." *Id.*; *see also* Ind. Code §§ 34-7-7-1 to -10. Indiana's statute "applies to an act in furtherance of a person's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana in connection with a public issue or an issue of public interest." Ind. Code § 34-7-7-1.

When faced with meritless retaliatory SLAPP lawsuits designed to chill a person's or legal entity's constitutional rights of petition or free speech, "Indiana's anti-SLAPP statute provides a defense." *Gresk*, 96 N.E.3d at 566. An integral component of the anti-SLAPP statute "is balancing a plaintiff's right to have his or her day in court and a defendant's free speech and petition rights, while simultaneously providing a framework to distinguish between frivolous and meritorious cases." *Id.* at 568. "If the lawsuit stems from a legitimate legal

wrong, it is not a SLAPP." *Id.* "But, if the lawsuit is filed for an ulterior political end, it is a SLAPP." *Id.*

> Defendants may invoke the anti-SLAPP defense when faced with a civil action for acts or omissions "in furtherance of the person's right of petition or free speech" under the United States Constitution or Indiana Constitution "in connection with a public issue" and "taken in good faith and with a reasonable basis in law and fact."

*Id*. at 568-69 (quoting Ind. Code § 34-7-7-5).

[19] When a person moves to dismiss under that statute, the motion "is treated as a motion for summary judgment." *Id*. at 567.

> Our standard of review for summary judgment cases is well-settled. When we review a trial court's grant of a motion for summary judgment, our standard of review is the same as it is for the trial court. Summary judgment is appropriate only where the moving party has shown that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. All factual inferences must be construed in favor of the non-moving party, and all doubts as to the existence of a material issue must be resolved against the moving party. Summary judgment is a high bar for the moving party to clear in Indiana.

*Burris v. Bottoms Up Scuba–Indy, LLC*, 181 N.E.3d 998, 1003-04 (Ind. Ct. App. 2021) (internal citations and quotation omitted). Moreover,

> [w]e will not reweigh the evidence but will liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial. The party who lost at the trial court has the

burden to persuade the appellate court that the trial court erred. A trial court's grant of summary judgment is clothed with a presumption of validity. A grant of summary judgment may be affirmed by any theory supported by the designated materials.

*Perkins v. Fillio*, 119 N.E.3d 1106, 1110-11 (Ind. Ct. App. 2019) (internal citations omitted).

[20] Here, the trial court issued findings of fact and conclusions of law in support of its order dismissing Dr. Kay's complaint. "Special findings are not required in summary judgment proceedings and are not binding on appeal[,]" but they offer this Court valuable insight into the trial court's rationale and facilitate appellate review.[1] *Coulter v. Caviness*, 128 N.E.3d 541, 545 (Ind. Ct. App. 2019).

[21] Dr. Kay argues that the trial court shifted the burden to her to prove her defamation claim, but the only issue before the court was whether The Irish Rover proved its anti-SLAPP defense. We agree with Dr. Kay that she "was not required to prove actual malice by clear and convincing evidence at the summary judgment stage of the proceedings." *See Stabosz v. Friedman*, 199 N.E.3d 800, 810 (Ind. Ct. App. 2022), *trans. denied*. However, as explained

---

[1] As a separate issue in her brief, Dr. Kay claims that the trial court erred by adopting The Irish Rover's proposed findings "virtually" verbatim. Appellant's Br. at 50. But Dr. Kay acknowledges that this practice is not forbidden, *see id.* at 50-51, and we disagree with her claim that the trial court's findings of fact and conclusions of law are virtually identical to The Irish Rover's proposed order. She also argues that The Irish Rover's findings proposed an incorrect legal standard, which the trial court then utilized. But a trial court's findings of fact and conclusions of law in a summary judgment proceeding are not binding on the appellate court, and, therefore, we need not address Dr. Kay's claim that we should reverse and remand on that basis alone.

further below, once The Irish Rover designated evidence establishing that the newspaper did not act with actual malice, Dr. Kay was required to designate evidence to establish a genuine issue of material fact on that question, which she failed to do.

## Whether The Irish Rover's Publication was Taken in Good Faith and with a Reasonable Basis in Law and Fact.

[22] The precise question before our court is whether the designated evidence demonstrates as a matter of law that The Irish Rover's actions were taken in good faith and with a reasonable basis in law and fact.[2] "In the context of defamation law, 'good faith' has been defined as a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and a belief that one's conduct is not unconscionable." *401 Pub. Safety v. Ray*, 80 N.E.3d 895, 900-01 (Ind. Ct. App. 2017) (citing *Nexus Grp., Inc. v. Heritage Appraisal Serv.*, 942 N.E.2d 119, 122 (Ind. Ct. App. 2011)), *trans. denied*. The standard can be met by evidence demonstrating that The Irish Rover "did not entertain serious doubt regarding the truth" of its article; that The Irish Rover "believed that the statements and opinions expressed in it were fair and reasonable" at the time of its publication; and that, in writing the article, The Irish Rover based its information on "reliable sources." *Pack v. Truth Publ'g Co., Inc.*, 122 N.E.3d 958, 966 (Ind. Ct. App. 2019) (citing *CanaRx Servs., Inc. v. LIN Television Corp.*, 2008

---

[2] Dr. Kay does not challenge whether The Irish Rover's news articles were in furtherance of the right of petition or free speech in connection with a public issue. Appellant's Br. at 36.

WL 2266348, at *7 (S.D. Ind. 2008)). Finally, we observe that "[w]hether a defendant acted in good faith in making a statement usually is a question of fact for the jury." *Kelley v. Tanoos*, 865 N.E.2d 593, 598 (Ind. 2007) (citation omitted).

[23] In *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446 (Ind. 1999), our supreme court identified five circumstances where the evidence will *not* demonstrate good faith:

> (1) where a story is fabricated by the defendant; (2) where the story is the product of defendant's imagination; (3) where the story is based wholly on an unverified anonymous telephone call; (4) where the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation; and (5) where there are obvious reasons to doubt the veracity of the informant or the accuracy of the informant's reports.

*Id*. at 462 n.27 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

[24] In *Pack v. Truth Publishing Company, Inc.*, The Elkhart Truth published an article concerning the Middlebury Community School Corporation's decision to fire a teacher, who in turn, sued the school district for religious discrimination. 122 N.E.3d at 962. The article stated that the school corporation had fired the teacher for "'insubordination, immorality[,] and *incompetence*.'" *Id.* (record citation omitted and emphasis in original). The teacher disputed that he was fired for "incompetence" and believed that the use of that term would affect his ability to find reemployment. *Id.* The newspaper refused to grant the teacher's request to retract its use of that word. *Id.* Thereafter, the teacher sued the

newspaper for defamation, and the newspaper filed a motion to dismiss the teacher's complaint under the anti-SLAPP statute. *Id*. at 962-63.

[25] After the trial court granted the newspaper's motion for summary judgment, the teacher appealed. This court concluded that the newspaper's designated evidence established a prima facie showing that its publication of the article was taken in good faith and with a reasonable basis in law and fact. The newspaper's reporter investigated the matter by speaking to the teacher, his attorney, and the school corporation's superintendent. *Id.* at 966-67. The reporter also relied on the School Board's press release, which was publicly available, and he obtained the School Board's findings relating to the teacher's firing by making a public records request that the reporter reviewed before writing the article. *Id*. at 967. The reporter also relied on documents from the federal court litigation. *Id.* We observed that the article was based on reliable sources, was not fabricated, and was not based on anonymous sources or sources wholly lacking in credibility. *Id.* We also concluded that the reporter's "use of the word 'incompetence' fairly characterized and summarized the School Board's findings and decision to terminate" the teacher's employment. *Id*.

[26] We rejected the teacher's argument that he designated evidence creating a genuine issue of material fact by alleging that the School Board's findings were confidential and an article premised in part on confidential information could establish a lack of good faith. *Id.* at 967-68. We noted that the teacher did not designate any evidence showing that the findings were confidential and,

regardless, that he put those findings at issue when he filed his federal lawsuit for unlawful termination of employment. *Id.* at 968.

[27] The teacher also designated the affidavit of an expert on secondary education and employment who averred that reasons for dismissal are "'not open to interpretation from the press or generalizations of a reporter[,]'" that the superintendent should not have released the School Board's findings to the reporter, and the reporter should not have used the term "incompetence" as a reason for the teacher's dismissal because that word was not used in the findings and had a specialized meaning in that context. *Id.* at 963. The expert believed that the reporter "knew exactly what he was writing and the ramifications of that writing" in using the term "incompetence," which the expert believed would result in the end of the teacher's career. *Id.* But we concluded that this designated evidence did not create a genuine issue of material fact because the expert was "not competent to testify" to the reporter's state of mind. *Id.* at 968 (stating that, because this evidence would not be admissible at trial, it would not be considered on summary judgment).

[28] Here, we agree with the trial court that the undisputed facts established that The Irish Rover's two articles were written in good faith and that the alleged defamatory statements were not false. The October 12, 2022, article is titled "Keough School Professor Offers Abortion Access to Students." Appellant's App. Vol. 2, p. 153. The article discusses a panel Dr. Kay participated in and her opinions on the ineffectiveness and immorality of abortion bans. The newspaper quoted Dr. Kay as stating that her "view runs afoul of Church

teaching, but in other areas, [her] positions are perfectly aligned [with the Church.]" *Id.* The article included a photograph of the sign on Dr. Kay's office door, which stated, "This is a SAFE SPACE to get help and information on ALL Healthcare issues and access – confidentially with care and compassion[.]" *Id.* The sign also included the letter "J" in a circle, which the article recognized to "denote Notre Dame professors who are willing to help students access abortion." *Id.* at 154. In support of that statement, the article cited to a social media post where Dr. Kay stated, "'[w]e are here (as private citizens, not representatives of ND) to help you access healthcare when you need it, and we are prepared in every way. Look for the 'J'[,], Spread the word to students!'" *Id.*

[29] The article also discussed the legality and availability of Plan B and Plan C abortion pills. In particular, the article stated that, "in reference to these pills," Dr. Kay had tweeted, "'Will help as a private citizen if you have issues w access or cost. DM me [sic].'" *Id.* The article described Dr. Kay's retweets of posts from groups concerning reimbursement of costs of obtaining an abortion out of state or getting Plan C pills by mail. *Id.* The article stated that the sign on her office door was later removed and her tweets referencing abortions for students were later deleted. *Id.* at 154-55. The article reported that, during the panel event, Dr. Kay was asked if her statements promoting abortion were aligned with "Church teaching and Notre Dame policy," and Dr. Kay responded that

she was not actively promoting abortion, but then later clarified, "[o]h, I am doing that as a private citizen . . . ." *Id*. at 154.[3]

[30]     The Irish Rover published its second article on March 22, 2023, which was titled, "Tamara Kay Explains Herself to Notre Dame Democrats."[4] The College Democrats had invited Dr. Kay to speak about her career and research and how her work has impacted "'her activism around abortion rights post-*Dobbs*[.]'" *Id*. at 161. In her complaint, Dr. Kay challenged the following specific statements from the article as false and defamatory: 1) that Dr. Kay was "posting offers to procure abortion pills on her office door"; 2) that Dr. Kay said to the audience, "if you have that academic freedom, you should use it"; and 3) that Dr. Kay acknowledged that the students in the crowd could not be as forward in their pro-abortion activities as she is and stated, "I can't impose that on you . . . but I'm doing me, and you should do you."[5] *Id*. at 46-47, 162.

---

[3] In her complaint, Dr. Kay did not specifically allege that any of the statements in the October article were untrue or defamatory. *See* Appellant's App. Vol. 2, p. 46. A plaintiff who sues for defamation must set forth the alleged defamatory statements in his or her complaint. *See Bd. of Trustees of Purdue University v. Eisenstein, 87 N.E.3d 481, 499 (Ind. Ct. App. 2017)*. As most of the article contains quotes from Dr. Kay's social media or the sign on her office door, she could not reasonably question the veracity of the statements in the article. It appears that her claim of defamation regarding the October article is based solely on the title of the article. *See id.* (explaining that, "'[w]hen specific statements that are alleged to be defamatory have not been sufficiently identified in a plaintiff's complaint, an award of summary judgment for the defendant is proper'").

[4] In its designated evidence, The Irish Rover submitted an article co-authored by Dr. Kay that the Chicago Tribune published on March 6, 2023. Appellant's App. Vol. 2, pp. 126-33. That article discusses a federal lawsuit to overrule the Food and Drug Administration's approval of mifepristone, which is used to terminate early pregnancies. Dr. Kay and her co-authors expressed their belief that banning the medication would do little to decrease the number of abortions overall but would make access to abortion more expensive.

[5] During the panel discussion, an audience member asked Dr. Kay how students should have conversations about abortion "during this time" and referenced the University's statement that the students have academic

The article also included Dr. Kay's faculty photo, which she did not give the paper permission to use.

[31] The Irish Rover's statements in their articles concerning Dr. Kay were quotes from Dr. Kay's social media, statements paraphrasing Dr. Kay's statements at the panel event, or statements discussing Dr. Kay's prior publications. Included in its designated evidence, The Irish Rover submitted copies of the tweets referenced or quoted in the October article and a transcript from the March panel event. The newspaper also submitted articles published in 2022 and 2023 by (or co-authored by) Dr. Kay addressing access to abortion, and the burdens and negative effects of abortion bans.

[32] Dr. Kay never explicitly stated that she would assist a student by procuring abortion pills for that student. But The Irish Rover made a reasonable inference from Dr. Kay's own statements that she would do so. It was reasonable for The Irish Rover reporters to conclude that assistance or help would include providing information to a student on how abortion medication could be obtained. As in the *Pack* decision, here, the articles were not fabricated and were not based on unverified anonymous sources or sources wholly lacking in

---

freedom. Appellant's App. Vol. 2, p. 201. Dr. Kay responded, "you have to really be fully committed to activism to be able to stick your neck out like I am right? [B]ecause I can't impose that or say you should do it. You know, you have to do what you have to do. And I think what I've come to is I'm doing me, and other folks can do them." *Id*. at 202. Dr. Kay also stated, "if you don't have academic freedom, you don't have a university. You can't call it a university." *Id*.

credibility. Therefore, The Irish Rover presented a prima facie case that the articles had a "reasonable basis in fact."

[33] Dr. Kay was therefore required to designate evidence to establish that the statements lacked a "reasonable basis in fact." In response to The Irish Rover's motion to dismiss, Dr. Kay designated her own affidavit and described her only interaction with a student staff member of The Irish Rover. In particular, she stated that Joseph DeReuil had spoken with her after the September 2022 panel event but did not ask to interview her or disclose the fact that he was recording their conversation. Appellant's App. Vol. 3, pp. 88-89. Dr. Kay stated that DeReuil did not ask her about the sign on her office door, what she meant by "healthcare" or what the "J" symbolized. *Id.* at 89. Dr. Kay averred that the "J" stood for "'Jane Doe,' which is how victims of sexual assault are typically referred to" and that she had used the "J" to express that she is "an ally for victims of sexual assault." *Id*. at 87-88.

[34] Dr. Kay's affidavit also quoted an email she had received from DeReuil asking for a meeting to continue their discussion about Dr. Kay's abortion position and an email received within hours of DeReuil's email from a Holy Cross student asking for Dr. Kay's assistance in procuring Plan C. Dr. Kay did not respond to either email because she assumed that "the close proximity in time" of receipt "was not a coincidence . . . ." *Id*. at 91.

[35] Dr. Kay averred that the sign on her office door "pertained to student sexual assaults" and "did not pertain to abortion." *Id.* at 92. And she claimed that a

statement in the October article that she used the "panel as a platform to explain why she thought abortion bans are ineffective and immoral, complementing her work to bring abortion to Notre Dame students" was false and defamatory. *Id.* at 92. Likewise, Dr. Kay claimed that The Irish Rover's statements that she offered help to obtain abortion medications and abortion services were false and defamatory.[6] *Id.*

[36] None of Dr. Kay's public statements discussed in The Irish Rover's articles referenced her specific concerns for victims of sexual assault. She expressed those concerns in private emails between herself and other University faculty members. However, her public statements, her social media posts, and her writings concerned access to abortion services or reproductive healthcare.

[37] We therefore conclude that Dr. Kay's designated evidence does not create a genuine issue of material fact concerning whether The Irish Rover had a reasonable basis in fact to publish the statements in the two articles. The Irish Rover's reporters reasonably concluded that Dr. Kay was generally addressing access to abortion and assistance to students who needed information about procuring an abortion.

[38] Even if Dr. Kay would be able to prove that she intended only to assist sexual assault victims who wanted an abortion, Dr. Kay would also have to prove that

---

[6] However, as we noted above, Dr. Kay did not specifically claim that any of these statements were false and defamatory in her complaint.

The Irish Rover acted with actual malice at trial.[7] *See 401 Public Safety v. Ray*, 80 N.E.3d 895, 900 (Ind. Ct. App. 2017), *trans. denied*. "Actual malice exists when the defendant publishes a defamatory statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id*. (quoting *Shepard*, 847 N.E.2d at 225). To address whether the publisher's conduct was with reckless disregard of the truth, we consider its state of mind and whether a reasonably prudent person would have published the statements or investigated before publication. *Poyser v. Peerless*, 775 N.E.2d 1101, 1107 (Ind. Ct. App. 2002).

[39] The Irish Rover designated evidence via deposition testimony from the authors of the articles that they believed that the inferences that they made from Dr. Kay's own statements, publications, and social media posts, which they published in the articles, were true. While it is true that DeReuil could have specifically asked Dr. Kay what the "J" on her office door stood for[8] and what she specifically meant by her statements about helping individuals who needed access to healthcare, DeReuil's failure to do so is not evidence of actual malice, particularly in light of the undisputed fact that he asked to meet with Dr. Kay before the article was published but she did not respond to the request.

---

[7] A person claiming defamation where the speech relates to a matter of public concern must prove that the communicated statements were false, made with actual malice, publication, and damages. *See 401 Public Safety v. Ray*, 80 N.E.3d 895, 900 (Ind. Ct. App. 2017), *trans. denied*.

[8] The Irish Rover designated evidence that the "J" could have been a reference to the Jane Collective, a pro-choice group that offered to assist women to obtain abortions by transporting them across state lines.

[40] The Irish Rover designated evidence that one of its missions is to articulate and defend the Catholic character of the University. And in support of its mission, it was exercising its First Amendment right to free speech when it chose to publish articles about a University faculty member whose views and teachings were diametrically opposed to the University administration's stated position on the issue of abortion. There is no evidence that authors of the articles asked the University to sever its employment contract with Dr. Kay or impose any other type of penalty. There is also no designated evidence that The Irish Rover encouraged others to request that the University terminate Dr. Kay's employment. And, in response to The Irish Rover's designated evidence, Dr. Kay designated evidence alleging that The Irish Rover's investigation of her statements was potentially inadequate and that other professors and a student pro-life group had encouraged The Irish Rover to publish the articles. But those designations do not establish a genuine issue of material fact on the question of actual malice.

[41] The designated evidence thus established that The Irish Rover reporters believed that the statements in their articles were true, and, therefore, Dr. Kay would not be able to prove her claim of defamation. For this reason, we conclude that the designated evidence establishes that The Irish Rover's publication of the articles was reasonable in law.

[42] For the same reasons, The Irish Rover also presented a prima facie case that its publications were made in good faith. The designated evidence established that, when The Irish Rover published the articles, the authors of those articles

believed that the statements and opinions expressed in it were fair and reasonable and that, in writing the articles, The Irish Rover based its information on reliable sources, particularly as the source for most of the information was gleaned from Dr. Kay's own statements, her social media, and publications. And, again, Dr. Kay did not designate any evidence that would establish a genuine issue of material fact on the question of whether The Irish Rover acted in good faith when it published the articles at issue.

## Conclusion

[43] The designated evidence established as a matter of law that The Irish Rover acted in good faith and in reasonable basis in law and fact. Therefore, the trial court properly dismissed Dr. Kay's complaint under Indiana's anti-SLAPP statute.

[44] Affirmed.

Brown, J., and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT

Kimberly D. Jeselskis
William J. Brinkerhoff
Hannah Kaufman Joseph
Jeselskis Brinkerhoff and Joseph, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

James Bopp, Jr.
Taylor C. Shetina

The Bopp Law Firm, PC
Terre Haute, Indiana